(59 South. 837.)

No. 19,396.

POTTS v. REYNOLDS.

In re REYNOLDS.

(Oct. 21, 1912.)

*(Syllabus by the Court.)*

1. LIBEL AND SLANDER (§ 140*)—SLANDER OF TITLE—JUDGMENT.

Where, in a jactitation suit, plaintiff, alleging possession under title, prays that defendant be ordered to assert whatever title he may rely on, or disclaim title, and that he be enjoined from making any further claim of ownership, and defendant, setting up possession in himself, under a title translative of property, emanating from plaintiff, prays that he be quieted in his possession, and that plaintiff's suit be dismissed, a judgment, passing upon the validity of the respective titles, and perpetually enjoining defendant "from making any further claim of ownership to" the property in dispute, is unauthorized.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 397–401; Dec. Dig. § 140.*]

2. MORTGAGES (§ 608½*)—LIBEL AND SLANDER (§ 140*)—REDEMPTION FROM MORTGAGE—ACTION TO REDEEM—EVIDENCE—JACTITATION SUIT—TITLE OF PLAINTIFF.

A person who has executed an instrument purporting to be an act of sale of real estate may bring a direct action to have it decreed to be in effect an act of mortgage, and in support of such action may introduce in evidence a counter letter, whereby the vendee agrees to reconvey the property on certain conditions, and oral testimony of his continued possession and of the inadequacy of the price; but the character of the transaction, and the question whether the act was intended as a sale or a mortgage, can be determined only after a hearing, and, even though it be found that it was intended as a mortgage, the inscription of the instrument can be canceled only on payment of the debt secured by such

mortgage. But such person has no right to assume that an instrument executed by him and purporting to be an act of sale, will be held to be other than as it purports, and, upon the basis of such assumption, further assume the position of plaintiff in an action of jactitation, since, upon the face of the papers, he cannot be heard to set up in himself a possession adverse to the peaceable possession which, as against his own acts, even by an instrument under private signature, he has warranted his apparent vendee.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 1815; Dec. Dig. § 608½;* Libel and Slander, Cent. Dig. §§ 397–401; Dec. Dig. § 140.*]

*(Additional Syllabus by Editorial Staff.)*

3. DEEDS (§ 92*)—CONSTRUCTION—STATUTORY PROVISIONS.

An instrument purporting to be a sale by an act under private signature, duly recorded, of immovable property, is to be interpreted in accordance with Civ. Code, arts. 1920, 2242, 2442, 2476, 2479, 2504, relating to public act transferring immovables and the tradition or delivery of such immovables.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. § 230; Dec. Dig. § 92.*]

Action by Bingley Potts against J. E. Reynolds. On application by defendant for certiorari or writ of review to the Court of Appeal, Parish of Bienville. Judgment for plaintiff set aside, and suit dismissed.

J. E. Reynolds and W. U. Richardson, both of Arcadia, for applicant. Barnette, Roberts & Goff, of Arcadia, for respondent.

### Statement of the Case.

MONROE, J. This is a jactitation suit, in which the district court gave judgment for plaintiff, enjoining defendant from asserting title to 240 acres of land, and awarding plaintiff damages in the sum of $50, which judgment was amended by the Court of Appeal (one judge dissenting), by disallowing the claim for damages, and, as amended, affirmed. The matter is brought up for review at the instance of defendant. Plaintiff alleged possession, as owner of the land in question, and defendant excepted, on the grounds that the petition discloses no cause or right of action, that plaintiff is not in

possession, and that his allegations are vague and indefinite, and fail to set forth in what manner the slander complained is committed; and, the exceptions having been referred to the merits, he answered, with reservation of his rights, alleging that he has been in possession under a recorded deed from plaintiff for more than 10 years and that his title cannot be attacked, save in a petitory action, and claiming certain damages, in reconvention.

The facts disclosed by the evidence are as follows:

Plaintiff bought the land in 1888, at 15 cents an acre, and (probably) in the latter part of 1898, or early in 1899, executed an instrument in writing, reading:

"State of Louisiana, Parish of Bienville.

"Know all men by these presents that I, Bingley Potts, for and in consideration of certain lands furnished me for the year 1899, have this day, and do, by these presents, bargain, sell, transfer, and deliver unto J. E. Reynolds all my rights and interest in and to the following, to wit: The S. W. ¼ of section 18, Tp. 15, range 4 W. and the S. ½ of the S. E. ¼ of section 13, Tp. 15, range 5 W., all in Bienville Parish, Louisiana, and containing 240 acres, to have and to hold forever. And for a valuable consideration I hereby quitclaim the above described property to J. E. Reynolds, to have and to hold forever."

Defendant (probably) upon the same day executed a separate instrument, as follows:

"I, by these presents, agree and bind myself to sell, at any time during the year 1899, all or any part of [describing the land as in the conveyance above recited] to Bingley Potts or Willie Potts, at 50 cents per acre; that is, to sell them my interest in said land at that price, and not to sell to any one else at any price, during the year 1899, without the consent of said Potts."

Neither of the instruments was dated, but the conveyance from Potts, signed by him and witnessed by his son, Willie, and by J. A. Dorman, was recorded April 30, 1902; the consideration thereof being the payment by Reynolds of two accounts, one for rent, and one for merchandise, due by Potts

to I. H. Davis, concerning which Reynolds, in his testimony, says:

"I don't now remember what the price was; but at that time the price of the land was the two accounts, and the exact amount was at that time definitely known by both Potts and myself. * * * I bought the accounts from Davis at a less price than the accounts amounted to, and could, therefore, afford to sell the place back to Bingley Potts, within the year, at 50 cents an acre, and still get as much money as I paid Davis for the accounts."

He further testifies as follows:

"Q. Now, Mr. Reynolds, I will ask you to state if this transfer here was not simply to secure a debt, and was not intended as a transfer and sale of this land? A. It was not, in any sense, to secure a debt. * * * Q. When, if at any time, has Bingley Potts ever complained about the sale of the land to you, or disputed your title? A. Never, until the filing of this suit. He never made any complaints himself, at all. Q. Just state to the court what offers Bingley Potts has ever made to you to rent this land from you—what conversations you have had in which he recognized you as owner? * * * A. I can't remember the exact words that he said to me; but he talked about buying the land from me, and I have an indistinct recollection of his applying to me to rent the land for his son, and of an agreement we entered into by which I was to allow them to cultivate the land that was under fence—there were a few acres under fence—for the keeping up of the fence that was around it, and for keeping people from trespassing on the land that was not under fence; but Bingley Potts at no time ever did or said anything in any way questioning my ownership of the land since I purchased it, to my knowledge. * * * Potts never tried to adjust this matter in his life with me in any other way than to try to buy it, and I never knew anything about his being about to bring suit until the papers were filed, and I haven't seen him since the papers were filed, until yesterday, and the conversations that I had with Potts were along from the first year after I bought it for two or three years"

Plaintiff, though admitting his signature to the conveyance, testifies that he has no recollection of having executed it, and that the only instrument which he remembers to have signed was the counter letter, which was delivered to him (and which does not bear his signature). He further testifies as follows:

"Q. Now, why was it that you took that document from Mr. J. E. Reynolds, if you didn't give him a deed to the land that he was going

to sell you at 50 cents per acre? A. Mr. Reynolds— Now, when he wrote that document, as well as I understand it all, seems to me that he had bought Mr. Davis' claim, and I had give Mr. Davis— He was going to take it up, and was going to call us to court in June, and I understood that this document was to be held until the June term of court, and he was to notify us and bring us to court in June; but he never did notify us to come to court, and we held the document until we was tired of it, and thought we would bring it back to him, and he was to call us to the June term of court—before the June court—and we never did get any notice, and that was my understanding at that time when that document was given. Q. Now, didn't you tell Mr. Williams that you had not anything to do with that land, and tried to keep your son from having to do with it, or words to that effect? A. I might have told him that. He asked me several questions, and I gave him— No. sir; I don't really remember, but I don't think I did; but I— Q. Just answer the question? A. Yes, sir. * * * Q. Did you ever see Mr. Reynolds, after you signed that deed, until this suit was filed? A. Yes, sir; I saw him two or three times, in passing and going by here, paying taxes, going to the courthouse. Q. Did you talk with him about this land at any of those times? A. Yes, sir; I remember, once, me and you talked about it. Q. Didn't J. E. Reynolds tell you, at that time, that your time to buy this land at 50 cents an acre had expired, but that if you wanted to purchase the land at that price, even then, he would permit you to do it, or words to that effect; and you told him that you didn't want to have anything else to do with it? A. No. sir; I don't remember anything like that. I remember you talking—said something about rent, and I told you that I was not working the land, but my son was working it, and you could see him about the rent."

Plaintiff's son, Willie Potts, who, with defendant, is named in the counter letter, testifies, in part as follows:

"Q. (by defendant). Now, Will, wasn't you one of the parties that came to Arcadia and saw me out here, east of the courthouse, and tried to buy this place from me? A. Yes, sir; I remember mentioning buying it from you, once. * * * Q. Now, if that land was worth $2 an acre, cash, why didn't you and your father buy it back for 50 cents. You had the right reserved to you, in that counter letter. Why didn't you buy it back? * * * A. Mr. Reynolds, when he gave papa the contract, he told him he would write him in June to let him come back and see about closing the contract or something, and he never did write him, and that is why, once in a while, along, he would mention buying the land from him. Q. Who would mention it? A. Papa; I mentioned it to Mr. Reynolds once or twice myself."

The witness testifies that there were probably 15 acres of the land under fence, and that he was cultivating it with his father's permission. The father testifies that there were 20 or 25 acres under cultivation, and admits that he might have told Williams that he had nothing to do with the land, and had tried to keep his son from having to do with it; and Williams testifies that he found 3 or 4 acres under cultivation, and that plaintiff told him that his (plaintiff's) son was doing the cultivating. Plaintiff does not live upon the tract in question, but upon an adjacent tract, and paid no taxes on it until, perhaps, as much as three years ago, when he consulted an attorney about the claim which he now asserts; the property having, in the meanwhile, been assessed to defendant, and the taxes, for part of the time, at least, paid by him.

## Opinion.

[1] The petition does not attack, or refer to, the act of conveyance from plaintiff to defendant, although that instrument was executed 11 or 12 years, and recorded about 8 years, before this suit was instituted; nor does the petition contain any intimation as to the character of slander of which plaintiff complains; and, as defendant's exceptions— of no cause or right of action, lack of possession in plaintiff, and vagueness of allegation in the petition—were referred to the merits, it was not until the trial on the merits, with reservation of defendant's rights in the exceptions, that it was developed that the slander of which plaintiff complains consists, mainly, in the existence, on the public records, of the inscription of the act of conveyance executed by him. The prayer of the petition is that defendant be ordered—

"to assert whatever title by which he claims said land, or disclaim any title thereto, and enjoining said defendant from making any further claims of ownership to said land, and for damages," etc.

Defendant, for answer, alleges that he has been in possession of the land in controversy for more than 10 years, under a recorded deed translative of property, executed by plaintiff, and that such possession is a bar against a suit of this character, and he prays that plaintiff's demand be rejected, and that his possession be quieted. By supplemental answer he alleges damages by reason of the cutting of timber, and, describing the title under which he asserts possession, prays judgment for such damages. The judgment of the district court, as affirmed, and as here complained of, reads (in part):

"That there be judgment in favor of the plaintiff  *  *  *  and against the defendant, * * * forever enjoining the said J. E. Reynolds from making any further claims of ownership to [describing the land]"

—which would seem to mean that defendant is to cancel the inscription of the conveyance, and abandon any claim that he may have, arising from either inscription or conveyance. The litigants, however, agree that the validity of the conveyance has not been put at issue, and it is evident that the judgment goes beyond the prayer of either petition or answer; the fact being that the conveyance and inscription were set up merely to support defendant's allegation that he is, and has been, in possession under a title, emanating from plaintiff, which upon its face is translative of property, and which must be attacked and set aside before plaintiff, in violation of his obligations, can be heard asserting the possession necessary to the maintenance of a jactitation suit. Plaintiff, on the other hand, without having, in his petition, suggested any previous transaction between him and defendant, professes, upon the trial of the case, to have forgotten that he executed the conveyance; but he produces the counter letter, introduces parol testimony to show that the price received for the property was inadequate, and that he has continued in possession, and upon that basis argues that the conveyance and counter letter, taken together, operate as a mortgage, and not as a sale. He nevertheless asks that the judgment, which, in effect, orders the cancellation of the inscription of the supposed mortgage, be affirmed, and this without the pretense that any part of the debt which it is supposed to represent has been paid.

[3] Upon its face the instrument executed by plaintiff translates to defendant the title which plaintiff alleges that defendant is slandering. In other words, it is a sale, by an act under private signature, duly recorded, of immovable property, and, as such, for the purposes of this litigation, between the parties thereto, is to be interpreted in accordance with the following, among other provisions of the Civil Code, to wit:

"Art. 1920. The rule, that the obligation to deliver a determinate object is perfect by the mere consent of the parties, and that the obligee is the owner from the time of such contract, is without any exception as respects immovables, not only between the parties, but as to all the world, provided the contract be clothed with the formalities required by law, that it is bona fide, and purports to transfer the ownership of the property."

"Art. 2479. The law considers the tradition or delivery of immovables as always accompanying the public act, which transfers the property. Every obstacle which the seller afterwards interposes to prevent the taking of corporal possession by the buyer is considered as a trespass."

"Art. 2242. An act under private signature, acknowledged by the party against whom it is adduced, or legally held to be acknowledged, has, between those who have subscribed it, and their heirs and assigns, the same credit as an authentic act."

"Art. 2442.  *  *  *  But this defect of registering shall not be pleaded between the parties who shall have contracted such act, their heirs or assigns, who are as effectually bound by a sale under made private signature, as if it were by an authentic act."

"Art. 2476. The warranty respecting the seller has two objects: The first is the buyer's peaceable possession of the thing sold, and the second is the hidden defects of the thing sold or its redhibitory vices."

"Art. 2504. Although it be agreed that the seller is not subject to warranty, he is, however, accountable for what results from his personal act; and any contrary agreement is void."

In Roe, Widow Green, v. Heirs of Bundy, 45 La. Ann. 398, 12 South. 759, it was held (quoting the syllabus) that:

"A vendor, until delivery to his vendee, occupies the position of a precarious possessor. His detention of the property is his vendee's possession. If a vendor could, before delivery, by some act of his own, such as is termed by the French commentators an 'acte de contradiction,' place himself in a position of hostility to his vendee and alter the character of his possession from that of its origin by an 'interversion of possession,' it would be required of him, for the purpose of acquiring ownership of the property by the 30 years' prescription, that he should clearly establish that knowledge of this change of position had been brought home by him to his vendee."

[2] The plaintiff now before the court might have brought a direct action to have the instrument executed by him as an act of sale decreed to be, in effect, an act of mortgage, and in support of such action he might have introduced in evidence the counter letter and oral testimony of his alleged continued possession and of the alleged inadequacy of the price, and he might, on proper allegation and proof, have obtained judgment to the effect that the transaction between him and defendant was intended merely to secure a debt; but the character of the transaction, and the question whether the act executed by him was intended as a sale or a mortgage, could only have been determined after the hearing of the case, and, even though it had been found that it was intended as a mortgage, its inscription could not have been canceled, save upon payment of the debt that it was intended to secure. But plaintiff had no right to assume that an instrument, executed by him and purporting to be an act of sale would be held to be other than it purports to be, and, upon the basis of such assumption, further assume the position of plaintiff in an action of jactitation, since, upon the face of the papers, he cannot be heard to set up, in himself, a possession adverse to the peaceable possession which, as against his own acts, he has warranted his apparent vendee

It is therefore ordered, adjudged, and decreed that the judgments of the Court of Appeal and district court, here complained of, be set aside, and that plaintiff's demand be rejected, and his suit dismissed, at his cost in all courts.